UNITED STATES ex rel. ROGER B.
SCHAGRIN and ROGER B. SCHAGRIN, PC,
doing business as SCHAGRIN
ASSOCIATES,

        Plaintiffs,

    v.

LDR INDUSTRIES, LLC; GB HOLDINGS,
INC.; LARRY GREENSPON; and DENNIS
GREENSPON,

        Defendants.

No. 14 C 9125

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

Defendants manufactured and imported steel pipe from China. Relators, Roger Schagrin and his law firm, allege that Defendants misclassified the pipe to avoid paying certain customs duties. Relators claim that this worked a fraud against the federal government in violation of the False Claims Act. On May 23, 2018, the Court granted Defendants' motion to dismiss, holding that Relators' claims were barred by the "government action bar." *See* R. 59 (*Schagrin v. LDR Indust.*, 2018 WL 2332252 (N.D. Ill. May 23, 2018)). The Court's holding made it unnecessary to address the alternative arguments for dismissal in Defendants' motion.

After the Court dismissed the complaint, Relators filed a motion to reconsider, R. 61, and the government filed a statement of interest in support of that motion, R. 75. For the following reasons, the motion to reconsider is granted. The Court also

considers the alternative arguments for dismissal Defendants made in their earlier motion and again grants the motion.

## Legal Standard

To prevail on a motion for reconsideration, a "movant must demonstrate a manifest error of law or fact or present newly discovered evidence." *Vesely v. Armslist LLC*, 762 F.3d 661, 666 (7th Cir. 2014). A motion to reconsider is proper where the court "has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (citations omitted). Motions for reconsideration are not, however, "appropriate vehicle[s] for relitigating arguments that the Court previously rejected or for arguing issues that could have been raised during the consideration of the motion presently under reconsideration." *Caine v. Burge*, 897 F. Supp. 2d 714, 717 (N.D. Ill. 2012) (citing *Caisse Nationale de Credit Agricole v. CBI Indus.*, 90 F.3d 1264, 1270 (7th Cir. 1996)).

A Rule 12(b)(6) motion challenges the "sufficiency of the complaint." *Berger v. Nat. Collegiate Athletic Assoc.*, 843 F.3d 285, 289 (7th Cir. 2016). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed

factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Tobey v. Chibucos*, 890 F.3d 634, 646 (7th Cir. 2018).

Additionally, it is well established that the FCA "is an anti-fraud statute and claims under it are subject to the heightened pleading requirements of Rule 9(b)." *Thulin v. Shopko Stores Operating Co., LLC*, 771 F.3d 994, 998 (7th Cir. 2014). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." "The reference to 'circumstances' in the rule requires the plaintiff to state the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff[.]" *United States v. Sanford-Brown, Ltd.*, 788 F.3d 696, 705 (7th Cir. 2015); *see also United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009) ("particularity . . . means the who, what, when, where, and how"). Nevertheless, courts should not "take an overly rigid view of the formulation," and the "requisite information . . . may vary on the

facts of a given case." *Pirelli v. Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011). Thus, although plaintiffs "'are not absolutely required to plead the specific date, place, or time of the fraudulent acts,'" they "still must 'use some alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *Id.* (quoting 2 James Wm. Moore, MOORE'S FEDERAL PRACTICE § 9.03[1] [b], at 9-18 (3d ed. 2010)). Rule 9(b) requires a "plaintiff to do more than the usual investigation before filing [a] complaint. Greater precomplaint investigation is warranted in fraud cases because public charges of fraud can do great harm to the reputation of a business firm or other enterprise (or individual)." *Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999) (citations omitted).

## Background

The Court repeats here the alleged facts recounted in the Court's May 23 opinion.

In international trade, products are sometimes imported to the United States and sold for less than their normal value. This practice is referred to as "dumping," and can hurt domestic companies who sell the same product at normal value. Similarly, some imports are able to be sold at less than normal value because of foreign government subsidies. The federal government can counter these practices with "anti-dumping" and "countervailing" customs duties, respectively.

According to Relators, around November 2007 the federal government imposed such duties on "circular welded pipe" (i.e., steel pipe of various specifications for use

in plumbing, among other uses) imported from China. R. 1 ¶¶ 1, 27. These duties amount to at least 30% and sometimes as much as 620%. *Id.* ¶ 27. After these duties were imposed, steel pipe imports from China decreased from 748,181 tons in 2007 to only 2,813 tons in 2009, representing only 0.6% of consumption in the United States. *Id.* ¶ 30. The duty regulations exclude "pipe suitable for use in boilers [and] superheaters," among other exceptions. *Id.* ¶ 2.

Defendant LDR Industries LLC, headquartered in Chicago, has imported steel pipe from China "since at least 2010." *Id.* ¶ 3. It sells steel pipe and related products to retail stores around the country including Home Depot. *Id.* ¶ 13. LDR owns companies in Taiwan and China that manufacture the pipe and prepare it for export to the United States. *Id.* Defendant GB Holdings, Inc. is the sole member of LDR, and has its headquarters at the same Chicago address as LDR. *Id.* ¶ 14. GB Holdings is owned by defendants Larry and Dennis Greenspon, who are also LDR's managers. *Id.* ¶ 15.

Relator Schagrin is an attorney experienced in the steel pipe industry and related matters of international trade. *Id.* ¶¶ 10-11. In 2010, Schagrin visited a Home Depot store and noticed LDR pipe imported from China. *Id.* ¶ 31. Based on his experience with the steel pipe industry he surmised that this pipe did not fall into any of the exceptions to the duty regulations, and was the same type of pipe LDR imported from China prior to implementation of the duty regulations. *Id.* ¶¶ 31-36. He also surmised that LDR had not paid the duties because the prices were too low.

*Id.* ¶ 37. Schagrin alleges that these conclusions would have been obvious to anyone with sufficient knowledge of the industry and regulations. *Id.* ¶ 38.

Schagrin reported his suspicions to the United States Customs and Border Protection Agency ("U.S. Customs") in 2012. *Id.* ¶ 43. U.S. Customs investigated and determined that LDR had misclassified its imported pipe in order to avoid paying duties. *Id.* ¶ 44. Relators allege that U.S. Customs "billed" LDR for unpaid duties in the amount of $6.7 million, which was later reduced to $4.85 million, covering pipe shipments in 2011 and 2012. *Id.* Relators also allege that U.S. Customs "continues to investigate the matter." *Id.*

Largely due to the penalties imposed by U.S. Customs, LDR declared bankruptcy on September 2, 2014. U.S. Customs filed a proof of claim in that proceeding on February 3, 2015. Defendants have attached that proof of claim (and its amendments) to their motion to dismiss. According to those documents, U.S. Customs claims the following:

> The loss of revenue of $14,376,139.08 was a result of incorrect classification in which LDR Industries, LLC underpaid Customs duties on entries from November 2007 to September 2012.
>
> The penalty is being assessed for $38,813,848.70 due to the findings that the entries were filed with incorrect classification with no rate and/or lower rates of dumping countervailing duties. The penalty also includes entries that were filed as consumption should have been subject to anti-dumping and countervailing. These findings are the result of the penalty pursuant to 19 U.S.C. § 1592.

R. 45-4 at 8; R. 45-5 at 8; 45-6 at 10. Additionally, in the initial proof of claim (although not in subsequent amendments), U.S. Customs stated that LDR "paid

dumping deposit rate of 3.39% for entries imported from Korea; however, it turned out that the merchandise came from China and the rate for dumping and countervailing should have been at 68.24% and 39.01%." R. 45-4 at 10.

Relators did not file a proof of claim in LDR's bankruptcy proceedings. Relators filed this action on November 13, 2014.

On October 6, 2016, the bankruptcy court entered an order approving LDR's Chapter 11 plan. *See* R. 45-2. That order notes that the plan "incorporates the terms of a settlement between [LDR] and [U.S. Customs] which resolves the Disputed Claim filed by [U.S. Customs] in the amount of $58,717,368.86[.]" *Id.* at 8. The plan itself provides that the settlement constitutes a "full and complete satisfaction of [LDR's] obligations for all Claims held by [U.S. Customs]." *Id.* at 21. No party contends that the plan constitutes a satisfaction of the claims against the Greenspons or GB Holdings at issue in this case.

## Analysis

### I.    Motion to Reconsider

The False Claims Act bars any action "which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party." 31 U.S.C. § 3730(e)(3). This is known as the "government action bar."

U.S. Customs' proof of claim in LDR's bankruptcy case stated that a "penalty is being assessed" and that the findings supporting the proof of claim were "the *result of the penalty* pursuant to 19 U.S.C. § 1592." R. 45-4 at 8; R. 45-5 at 8; 45-6 at 10

(emphasis added). In the May 23 opinion, the Court found that this language indicated that U.S. Customs had initiated a penalty proceeding against LDR prior to the bankruptcy proceeding. The Court also held that Relators' allegations in this case were "based on" the same "allegations or transactions" that were "the subject of" that penalty proceeding "in which the Government [was] already a party," such that the claims should be dismissed under the government action bar.

However, in support of Relators' motion to reconsider, the government has submitted affidavits from U.S. Customs indicating that—contrary to the Court's May 23 findings—no penalty proceeding was ever initiated. *See* R. 75-1; R. 75-2. The government contends that a penalty proceeding under 19 U.S.C. § 1592 can be initiated only by issuance of a pre-penalty notice pursuant to 19 U.S.C. § 1952, and no such notice was ever issued to LDR. *See* R. 75 at 3. The government contends further that U.S. Customs investigated LDR in 2012 and assessed LDR for unpaid customs duties. According to the government, the results of this investigation were the basis for the "estimated" potential penalties described in the bankruptcy proof of claim. *Id.* at 5. The government argues that the statements referencing a penalty proceeding concerned "contingent or unmatured" claims that U.S. Customs "might have" but never "actually assessed." *Id.*

Defendants argue that the government's characterization of the statements in the proofs of claim is contrary to the express language in those documents. But the Court need not delve into the reasons U.S. Customs used the particular language it did in submitting the proofs of claim to the bankruptcy court. Defendants apparently

do not dispute that U.S. Customs never issued a pre-penalty notice to LDR. Defendants also do not contend that investigation prior to the issuance of a pre-penalty notice could constitute a penalty proceeding for purposes of the government action bar under 31 U.S.C. § 3730(e)(3). Absent argument to the contrary from Defendants, the Court agrees with the government and Relators that issuance of a pre-penalty notice pursuant to 19 U.S.C. § 1592 is necessary for a penalty proceeding to be in progress such that the government action bar is implicated. Therefore, since there is no dispute that a pre-penalty notice was never issued, that fact is dispositive of the issue in this case at this point in the proceedings, and the Court must reverse its dismissal of the case based on the government action bar.

Defendants argue that this is not a proper basis for a motion to reconsider because Relators could have made this argument on the initial motion to dismiss. But, as Defendants also note, Relators did in fact make this argument. The Court rejected the argument because the language in the proofs of claim appeared to plainly state that a penalty proceeding had occurred prior to Relators filing this action. Now, however, the affidavits from U.S. Customs call that factual finding into question. Thus, reconsideration is appropriate on that basis.

## II.    Motion to Dismiss

Having dismissed the case based on the government action bar, it was unnecessary for the Court to address Defendants' alternative arguments for dismissal. Now having found that the government action bar is not a basis to dismiss the case (at least at this point in the proceedings), the Court turns to the other

arguments for dismissal of (1) the claims against the Greenspons and GB Holdings, and (2) the claims against LDR.

## A. Claims Against the Greenspons and GB Holdings

Relators allege the following theories of liability against the Greenspons and GB Holdings: (1) direct violation of the False Claims Act; (2) alter ego liability for LDR's violation of the False Claims Act; and (3) liability for conspiring to violate the False Claims Act. The Court addresses each in turn.

### 1. Direct Liability Under the False Claims Act

In general, to state a claim for a False Claims Act violation, a relator "must allege the following essential elements with particularity: (1) the defendant made a statement in order to receive money from the government; (2) the statement was false; and (3) the defendant knew the statement was false." *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 840 (7th Cir. 2018). In this case, the first element is different in that Relators do not allege false claims for payment *from* the government, but false statements made in order to avoid an "obligation" to pay customs duties *to* the government. But this also constitutes a violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G) (providing liability for "any person who— (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government"). Claims for violation of the False Claims Act must meet the heightened pleading standard of Federal Rule of

Civil Procedure 9(b). *See Lusby*, 570 F.3d at 853 (under Rule 9(b) "particularity . . . means the who, what, when, where, and how").

It is undisputed that LDR failed to pay certain customs duties, and that the government has sought payment from LDR. These facts supply the "what, when, where, and how" required by Rule 9(b). Of course, Relators also allege that the Greenspons and GB Holdings are the "who" in this case. Defendants argue that the complaint is deficient in this regard because Relators have not alleged "'specific fraudulent acts' by each defendant" and have failed to "provide representative examples of the conduct of each individual Defendant." R. 45 at 16. Thus, the question is not so much whether Relators' allegations satisfy Rule 9(b), as they have alleged a "who" and the other "circumstances of the fraud" itself. Rather, the question is whether Relators have satisfied Rule 8's plausibility standard for alleging that the Greenspons and GB Holdings are liable for that fraud.

Relators claim that GB Holdings and the Greenspons are liable here "for 'causing' LDR's underlying violations." R. 50 at 18 (quoting 31 U.S.C. § 3729(a)(1)(G)). Relators allege that the Greenspons "caused" LDR's violations because they were LDR's owners and managers, and the Greenspons' experience with the industry would have made it obvious that customs duties were not being paid. R. 1 ¶¶ 18, 39. Relators allege further that this information would have been obvious to anyone in the industry based on the following alleged facts: (1) Home Depot generally only sells pipe that is subject to duties; (2) the characteristics of the pipe indicate that it is subject to duties; and (3) the retail cost of the pipe was much too low considering the

relevant customs duties. R. 1 ¶¶ 37-38. In sum, Relators argue that the Greenspons must have known that LDR was not paying the required customs duties and they either directed that to happen or failed to prevent or stop it from happening.

"Generally, mere knowledge of the submission of claims and knowledge of the falsity of those claims is insufficient to establish liability under the FCA." *U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 714 (10th Cir. 2006); *see also United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 245 (3d Cir. 2004) ("[M]ere awareness that another may, or even has, chosen to make [a false] claim does not alone constitute 'causing a false claim to be presented.'"). Rather, a relator must allege that a defendant took an "active role" in the scheme. *See United States ex rel. Ailabouni v. Advocate Health & Hosps. Corp.*, 2017 WL 4310640, at *11 (N.D. Ill. Sept. 28, 2017) ("[The defendant] is not liable because mere knowledge of a fraud [cannot] sustain an FCA cause of action. To state a claim, Relator would have to allege that [the defendant] took an 'active role' in submitting false claims or material fraudulent documents to the government."); *see also United States ex rel. Kalec v. NuWave Monitoring, LLC*, 84 F. Supp. 3d 793, 802 (N.D. Ill. 2015) ("[Relators] must allege that [the defendants] had an active role in submitting a false claim to the government or in preparing fraudulent documents that were material to a claim to the government."); *U.S. ex rel. Lisitza v. Par Pharm. Cos., Inc.*, 2013 WL 870623, at *4 (N.D. Ill. Mar. 7, 2013) ("[T]he allegations in the complaint that [the defendants] knew of the [false claims]—even though they pass muster under Rule 9(b)—are not enough to state a claim. In addition to allegations of knowledge, the relator must

supply facts to plausibly assert that [the defendants] *caused* other parties' false statements or the submission of false claims. This requires some affirmative participation or action by these defendants that furthers the unlawful objective."); *U.S. ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F. Supp. 2d 719, 736 (N.D. Ill. 2007) ("[M]ere knowledge of the submission of claims and knowledge of the falsity of those claims is insufficient to establish liability under the FCA. Instead, . . . some sort of an affirmative action [is required].").

In assessing whether defendant has taken an "active role" that can subject the defendant to liability, "the appropriate focus of the inquiry is on the specific conduct of the person" alleged to have violated the statute. *Sikkenga*, 472 F.3d at 714. The Seventh Circuit has held that this inquiry is governed by "established" principles of proximate causation. *United States v. Luce*, 873 F.3d 999, 1012 (7th Cir. 2017). Requiring proximate cause for False Claims Act claims "comports with the [statute's] statutory purpose," by only permitting "'FCA claims to proceed against parties who can fairly be said to have caused a claim to be presented to the government, while winnowing out those claims with only attenuated links between the defendants' specific actions and the presentation of the false claim.'" *Id.* at 1012-13 (quoting *Sikkenga*, 472 F.3d at 714).

However, some district courts have held that allegation that a defendant's "failure to act" to stop fraudulent claims is a "course of conduct" that violates the False Claims Act. *U.S. ex rel. Long v. SCS Bus. & Technical Inst.*, 999 F. Supp. 78, 91 (D.D.C. 1998) *rev'd on other grounds sub nom. U.S. ex rel. Long v. SCS Bus. &*

*Technical Inst., Inc.*, 173 F.3d 870 (D.C. Cir. 1999); *see also United States v. President & Fellows of Harvard Coll.*, 323 F. Supp. 2d 151, 187 (D. Mass. 2004) ("Where a defendant has an ongoing business relationship with a repeated false claimant, and the defendant knows of the false claims, yet does not cease doing business with the claimant or disclose the false claims to the United States, the defendant's ostrich-like behavior itself becomes a course of conduct that allowed fraudulent claims to be presented to the government.") (internal quotation marks and citations omitted). "As a whole, these cases indicate that, in examining whether a non-submitting party has 'caused' the submission of a false claim or false statement, a court must look at the degree to which that party was involved in the scheme that results in the actual submission." *United States ex rel. Tran v. Computer Scis. Corp.*, 53 F. Supp. 3d 104, 127 (D.D.C. 2014).

The Court agrees with Relators' theory of the case to the extent that if the Greenspons knew that LDR—the company they owned and managed—was not paying customs duties, they can be liable under the False Claims Act for failing to rectify the situation. A corporate owner and manager's knowledge of fraudulent conduct by his company is not akin to that of a subordinate employee with no responsibility for the company's actions. Such an employee possesses only the power to report fraudulent conduct to supervisors or legal authorities. Relators do not argue that the Greenspons are liable for a mere failure to report, and the Court does not understand the False Claims Act to impose such liability. But when a person has the unfettered power, not simply to report, but to affirmatively stop fraudulent conduct,

and instead affirmatively decides to allow to the fraud to continue, and furthermore, then enjoys the resulting corporate profits, such a person has proximately caused the fraud, and can be liable under the False Claims Act. For a person with such power, knowledge of the fraud is sufficient to allege the "active role" necessary for liability, because the failure to act constitutes a course of conduct that proximately causes the fraud.

Having alleged that the Greenspons were LDR's managers and owners, Relators have plausibly alleged that the Greenspons had the power to alter LDR's policies with regard to paying customs duties. The question here is whether Relators have sufficiently alleged that the Greenspons had knowledge that the customs duties were not being properly paid. "Knowledge" under the False Claims Act is defined as either "actual knowledge," "deliberate ignorance," or "reckless disregard." 31 U.S.C. § 3729(b)(1)(A). "In the [False Claims Act] context, the reckless disregard required to show the necessary knowledge is an extension of gross negligence." *United States ex rel. Sheet Metal Workers Int'l Ass'n, Local Union 20 v. Horning Investments, LLC*, 828 F.3d 587, 593 (7th Cir. 2016). The Supreme Court has held that the False Claims Act's knowledge provision should be "strict[ly] enforce[ed]." *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2002 (2016).

Relators' argue that the Greenspons' must have had the requisite knowledge because the falsity of LDR's customs claims would be "obvious" to persons "in the industry." The Court questions whether the allegation of "obviousness" is well-pled, since it requires the Court to draw an inference which—not being "in the industry"—

the Court does not have the expertise to make. In any event, the more apparent problem with Relators' claims is that they have not sufficiently alleged that the Greenspons were sufficiently experienced in the industry to apprehend the "obviousness" of the customs violation. True, Relators allege that the Greenspons owned and managed LDR for many years. But Relators allege nothing about the Greenspons' specific responsibilities in the company. Relators also do not allege anything about LDR's size or corporate management structure from which the Court might infer the extent of the Greenspons' experience and knowledge of the industry. It is possible that the Greenspons were active managers of a relatively small business, and the products at issue here were a large percentage of that business. But it is equally possible, that the Greenspons owned a company that had expanded beyond their business acumen, and that they relied on subordinate officers to manage the details of overseas manufacture and importing, of many different products, and the pipes at issue in this case were merely a small percentage of that business. Some instances of the later scenario might evince "reckless disregard." But in other instances along the spectrum of possible descriptions of LDR's business, the Greenspons would not have had the requisite knowledge for liability under the False Claims Act, even if the Court could countenance Relators' allegations of obviousness. The complaint leaves these many possibilities open, such that Relators have only alleged that scenarios in which the Greenspons had sufficient knowledge are *possible*. But possibility is not enough to state a claim under Rule 12(b)(6). *See Iqbal*, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it

asks for more than a sheer possibility that a defendant has acted unlawfully.") Rather, Relators' allegations "must establish a nonnegligible probability that the claim is valid." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010). Otherwise, all corporate owner-managers would be liable for False Claims Act violations committed by their companies without regard to the degree of their involvement in the fraudulent scheme. The False Claims Act does not provide for such a broad scope of liability. *See Universal Health*, 136 S. Ct. at 2002 ("[C]oncerns about fair notice and open-ended liability can be effectively addressed through strict enforcement of the [False Claims Act's] materiality and scienter requirements.").

The Court notes that the Seventh Circuit has held that relators do not have to allege specific details about documents used to submit false claims if they are not in a position to have access to such documents. *See*, *e.g.*, *Pirelli*, 631 F.3d at 443; *Lusby*, 570 F.3d at 854-55. In *Pirelli* and *Lusby*, the Seventh Circuit reasoned that circumstantial allegations indicating that false claims were submitted are sufficient to satisfy Rule 9(b) even though relators do not know the specific dates, submitting person identities, and content of individual claims. Similarly, Relators here may not have access to information about LDR's inner workings.

But the principle permitting circumstantial pleading of claim submission is ultimately inapposite here, because in the cases in which it was applied, specific details about the individual claim documents were not necessary to draw a plausible inference of fraudulent conduct, and the identity of the actor potentially liable was not in question. Unlike those cases, the plausibility of fraudulent conduct *by the*

*Greenspons* is not present here. Rather, the Court has held that Relators have failed to satisfy Rule 8's notice pleading standard regarding the Greenspons' industry knowledge and responsibility within LDR. More must be alleged about the Greenspons' conduct as LDR managers and/or experience in the industry to be able to infer the level of knowledge necessary to allege liability.[1]

### 2. Alter Ego Liability for LDR's False Claims Act Violations

In addition to alleging that the Greenspons have violated the False Claims Act themselves, Relators allege that the Greenspons are liable for LDR's False Claims Act violations under an alter ego theory. (Although the Court has not addressed in detail whether Relators have sufficiently alleged that LDR violated the False Claims Act, the Court has noted that the facts underlying U.S. Customs' assessment of unpaid customs duties are likely sufficient to state a claim against LDR. The Court will address whether any claims remain against LDR below.)[2]

---

[1] This reasoning also serves as a basis to dismiss Relators' conspiracy claims. Moreover, the Court agrees with Defendants that the conspiracy claims are barred by the intracorporate conspiracy doctrine. *See U.S. ex rel. Chilcott v. KBR, Inc.*, 2013 WL 5781660 (N.D. Ill. Oct. 25, 2013) (applying the intracorporate conspiracy doctrine to dismiss False Claims Act conspiracy claims against corporate officers).

[2] The government's settlement with LDR in bankruptcy does not eliminate the possibility that the Greenspons and GB Holdings could be held liable for LDR's violation of the False Claims Act under an alter ego theory. *See Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449, 462 (7th Cir. 1991) ("the *alter ego* doctrine can be invoked to impose liability on a parent even when the plaintiff settles with the subsidiary"); *Cent. States, Se. & Sw. Areas Pension Fund v. Art Pape Transfer, Inc.*, 79 F.3d 651, 653 (7th Cir. 1996) ("The settlement agreement in *Lumpkin* did not release the buyer, and we were skeptical of the buyer's attempt to pierce *its own* corporate identity to take advantage of the release.") (emphasis in original); *see also Carpenters Pension Fund of Ill. v. Martinak*, 2018 WL 3232791, at *3 (N.D. Ill. July 2, 2018) (citing *Lumpkin*). No party contends that the bankruptcy plan

"'Generally, before the separate corporate identity of one corporation will be disregarded and treated as the alter ego of another, it must be shown that it is so controlled and its affairs so conducted that it is a mere instrumentality of another, and it must further appear that observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice.'" *Northbound Grp., Inc. v. Norvax, Inc.*, 795 F.3d 647, 652 (7th Cir. 2015) (quoting *Main Bank of Chi. v. Baker*, 427 N.E.2d 94, 101 (Ill. 1981)). "Once the first element of the test is established, *either* the sanctioning of a fraud (intentional wrongdoing) *or* the promotion of injustice, will satisfy the second element." *Wellness Int'l Network, Ltd. v. Sharif*, 727 F.3d 751, 774 (7th Cir. 2013), *rev'd on other grounds,* 135 S. Ct. 1932 (2015) (emphases in original). "Piercing the corporate veil is not favored and in general, courts are reluctant to do so." *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008).

Relators allege the following with respect to their alter ego theory of liability:

> LDR has operated as the alter ego of GB Holdings for purposes of committing the fraud alleged herein. As the sole member of LDR, GB Holdings exercises complete discretion over the decisions of LDR. LDR and GB Holdings also share common office space, addresses, and phone numbers as both companies are headquartered in the same location. In addition, there is overlap in ownership, officers, and personnel between the companies, with the owners of GB Holdings, Larry Greenspon and Dennis Greenspon, also serving as the managers of LDR. Furthermore, GB Holdings has not adequately capitalized LDR given that in or about September 2014, LDR filed for Chapter 11 Bankruptcy, in which LDR admitted that it was so

---

constitutes a satisfaction of the claims against the Greenspons or GB Holdings at issue in this case.

undercapitalized that it did not have sufficient funds to pay the full amount of customs duties owed on its imports.

*　　*　　*　　*

The Greenspons exercised complete discretion over the decisions of GB Holdings and LDR by virtue of their sole ownership of GB Holdings, which is the sole owner of LDR, as well as their position as managers of LDR. The Greenspons even own 600 N. Kilbourn, L.L.C., from which LDR leases its principal offices, with 600 N. Kilbourn Ave., Chicago, IL serving as the headquarters for both LDR and GB Holdings. In essence, the Greenspons created GB Holdings and other companies, like 600 N. Kilbourn, L,L.C., as shell companies for purposes of funneling their ill-gotten gotten gains.

Via the above-described ownership structure, the Greenspons extracted substantial sums of money from GB Holdings and LDR, amassing considerable personal wealth by depositing into the Greenspons' personal funds the unlawfully gained profit LDR obtained through fraudulently evading AD/CV duties, leaving LDR so undercapitalized that the company does not have sufficient cash to pay the full amount of customs duties owed to the U.S. Government on its imports. Instead, the Greenspons caused and expressly authorized LDR to file for bankruptcy in order to avoid having to pay these AD/CV duties.

R. 1 ¶¶ 15, 18-19.

It is unnecessary to address in detail Relators' allegations regarding the first element of an alter ego theory—i.e., that LDR was the Greenspons' instrumentality[3]—because Relators have failed to allege the second element—a fraud

---

[3] The Court notes that the "fact that a corporation has only one single shareholder is not proof that the corporation is the 'alter ego' of that shareholder." *Judson Atkinson*, 529 F.3d at 381; *Main Bank*, 427 N.E.2d at 101 ("Stock ownership alone in one corporation by another does not create an identity of interest between the two or create the relation of principal and agent, representative, or alter ego between the two."). So too for shared locations. *See Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 364-65 (7th Cir. 2016). But bankruptcy is evidence of undercapitalization.

or injustice—for much the same reasons as the Court discussed with respect to Relators' claim of direct liability. Relators' alter ego allegation boils down to the theory that the Greenspons' siphoning of LDR's ill-gotten profits from avoiding customs duties payments, so that LDR was forced to declare bankruptcy when U.S. Customs came calling, demonstrates fraud or injustice. The Court assumes that Relators are correct that the Greenspons "extracted substantial sums" from LDR to "amass[] considerable personal wealth." But the Court has rejected Relators' allegations that the Greenspons knew of fraudulent conduct by LDR. Without competent allegations of fraudulent conduct, the Greenspons' "extraction" of assets from LDR is not a plausible basis to pierce the corporate veil. Relators have alleged no details about the timing of any asset transfers that would make LDR's bankruptcy a sufficient basis to support alter ego liability absent additional allegations of fraudulent intent. And bankruptcy alone is insufficient to support such a showing. *See, e.g.*, *Lopez v. Ram Shirdi Inc.*, 2014 WL 4214892, at \*5 (N.D. Ill. Aug. 26, 2014); *Escobedo v. Ram Shirdi Inc.*, No. 2014 WL 4553186, at \*5 (N.D. Ill. Sept. 15, 2014). Therefore, Relators' claims against the Greenspons and GB Holdings based on an alter ego theory of liability are dismissed.

## B. Claims Against LDR

Relators concede that the government has released its claims against LDR in the bankruptcy proceeding. R. 50 at 10. But Relators argue that LDR should remain

---

And all of these facts together are likely sufficient to plausibly allege that LDR was the Greenspons' instrumentality. *See Northbound*, 795 F.3d at 652.

in the case as a defendant because they "are not seeking to recover damages from LDR," but "seek only a determination of LDR's liability." R. 50 at 10. Relators argue that this is analogous to circumstances in which a debtor discharged in bankruptcy may nevertheless be named in a lawsuit to recover from a surety. *Id.* (quoting *Matter of Shondel*, 950 F.2d 1301, 1307 (7th Cir. 1991)).

But unlike a surety arrangement, which contractually ties the liability of the surety to the liability of the debtor, liability under the False Claims Act is determined on a person by person basis. Relators have not cited a case holding that a relator alleging a defendant "caused" a violation of the False Claims Act must also sue the person who actually submitted the false document. This is likely because liability of the causing defendant does not necessarily imply liability by the submitter, as the submitter may have acted without the requisite scienter. *See United States ex rel. Ceas v. Chrysler Grp. LLC*, 2016 WL 6963060, at *5 (N.D. Ill. Jan. 19, 2016) ("The fact that the [non-defendant] relays the false statement verbally and/or through a written invoice charging the Government for the repairs . . . does not shield Defendant from liability under the FCA; as explained above, the FCA reaches claims that are rendered false by one party, but submitted to the government by another.'" (quoting *Mason v. Medline Indus., Inc.*, 731 F. Supp. 2d 730, 738 (N.D. Ill. 2010) ("The wealth of case law supports the proposition that the FCA reaches claims that are rendered false by one party, but submitted to the government by another.") (citing cases)).

In any case, because Relators concede that they have only sued LDR to establish liability for the Greenspons and GB Holdings, and the Court has held that

Relators have failed to state claims against the Greenspons and GB Holdings, the claims against LDR are also dismissed.

## Conclusion

For the foregoing reasons, Relators' motion to reconsider, R. 61, is granted. However, Relators' claims remain dismissed without prejudice. Should Relators believe they can cure the deficiencies described in this opinion, they may file a motion for leave to file an amended complaint attaching the proposed amended complaint showing the changes as compared against the operative complaint. The motion should be accompanied by a memorandum of no more than five pages explaining how the amended complaint cures the deficiencies of the current complaint. The deadline for such a motion is December 19, 2018. Defendants should not file a response unless the Court so orders. Unless Relators file a motion to amend, Relators' complaint will be dismissed with prejudice on December 20, 2018.

ENTERED:

Thomas M. Durkin

_____
Honorable Thomas M. Durkin
United States District Judge

Dated:  November 20, 2018