# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES *ex rel.* ROGER B. SCHAGRIN and ROGER B. SCHAGRIN, PC (d/b/a SCHAGRIN ASSOCIATES), | ) ) ) | |
| | ) | Case No. 14-cv-09125 |
| Plaintiffs-Relators, | ) | |
| | ) | Judge Thomas M. Durkin |
| v. | ) | Magistrate Judge Mary M. Rowland |
| | ) | |
| LDR INDUSTRIES, LLC, GB HOLDINGS, INC., LARRY GREENSPON, AND DENNIS GREENSPON | ) ) ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

Plaintiffs-Relators Roger B. Schagrin, PC, doing business as Schagrin Associates ("Schagrin Associates") and Roger B. Schagrin (collectively, "Plaintiffs" or "Relators"), by and through their undersigned counsel, hereby bring this action against Defendants LDR Industries, LLC ("LDR"), GB Holdings, Inc. ("GB Holdings"), Larry Greenspon, and Dennis Greenspon (the "Greenspons") (collectively, "Defendants"), alleging as follows:

## NATURE OF ACTION

1.      Defendants engaged in widespread fraud against the United States in violation of the False Claims Act ("FCA") by evading certain customs duties owed to the U.S. Government, including (1) antidumping ("AD") and countervailing ("CV") duties on standard circular welded pipe ("CWP" or "standard pipe") imported from China and (2) "marking duties" that automatically become due upon importation when goods are imported and distributed into the U.S. stream of commerce without proper country-of-origin markings.  In the process, Defendants

knowingly submitted and/or caused to be submitted false information to the Government for purposes of concealing the amount of customs duties owed.

2.     Standard carbon steel circular welded pipe ("CWP" or "standard pipe") from China has been subject to countervailing and antidumping duty orders (together "AD/CVD Orders") since 2008.  However, the scope of these AD/CVD Orders excludes, *inter alia*, "pipe suitable for use in boilers [and] superheaters."  To be usable in the United States, such tubing must meet ASTM specification A-178, "Standard Specification for Electric-Resistance-Welded Carbon Steel and Carbon-Manganese Steel Boiler and Superheater Tubes" (hereinafter "ASTM A-178"), or an equivalent proprietary specification.

3.     Since at least 2010, Defendant LDR has imported standard CWP from China into the United States by falsely representing to the U.S. Customs and Border Protection Agency ("CBP") on numerous occasions in various entry documents and forms that its pipe was classifiable as ASTM A-178 pipe suitable for use in boiler and super heaters, as exempt from antidumping and countervailing duties ("AD/CV duties").  LDR did so even though its imports were not made to ASTM A-178 or other boiler specifications and were the same products as the pipe imports LDR had properly classified as standard CWP prior to the AD/CVD Orders.  LDR further fraudulently failed to record or deposit the AD/CV duties owed.

4.     In fact, acting on information provided to it by Relators in or about July 2012, CBP found a shipment of LDR pipe that had entered the U.S. falsely classified as A-178 boiler tube, in that it was actually standard CWP subject to AD/CV duties.  Thereafter, CBP sent a bill to LDR in the amount of $6.7 million (which was later reduced to approximately $4.85 million) in AD/CV duties going back to shipments in 2011 and 2012 and continued to investigate LDR pipe imports.

5.      During Chapter 11 bankruptcy proceedings that were subsequently initiated by LDR to avoid paying these AD/CV duties, CBP found even more fraud by LDR.  Specifically, in the bankruptcy proceedings, CBP later submitted an unsecured proof of claim of over $58 million comprised of loss of revenue, fines, and penalties, in which CBP identified close to $20 million of AD/CV duties that LDR had fraudulently evaded. *See* Ex. 1, *In re LDR Industries, LLC*, Case No. 14-32138 (Bankr. N.D. Ill.) (Dkt. 45-6.)

6.      By falsely describing its imports and fraudulently claiming no AD/CV duties were owed, LDR was able to save substantial money over the years by evading these duties, which range from approximately 80 percent to over 600 percent of the dutiable value of the product.

7.      LDR fraudulently evaded these AD/CV duties knowing that its standard pipe imports do not meet the ASTM A-178 boiler tube requirements and are obviously unsuitable—indeed, quite dangerous—for boiler tube use, or use as any other product excepted from the AD/CVD Orders and as such, the pipe is plainly subject to the CWP AD/CVD Orders.

8.      In addition, as of the filing of Relators' initial Complaint, LDR was not properly marking its pipes with their countries of origin, in plain violation of black letter law.  LDR's pipes and pipe fittings were marked with small paper labels identifying them as foreign made. They did not have the proper stenciling, engraving, or otherwise permanent markings required by law to indicate country of origin.

9.      Given LDR's many years of experience importing steel pipe and tubes, the company is very familiar with the special, long-established country-of-origin marking requirements applicable to such imports.  There is thus no question that LDR knowingly and intentionally failed to properly mark its imported pipe fittings, which automatically gives rise to

what are referred to as "marking duties" in the amount of 10% of the value of the unmarked imports, which become due by operation of law upon importation. In the process, LDR likewise knowingly submitted false information to the Government and otherwise concealed the amount of marking duties the company owes, as well as the true origin of its pipe.

10.     Relators bring this action to recover damages and civil penalties on behalf of the United States as *qui tam* relators pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

**PARTIES**

11.     Relator Roger B. Schagrin, PC, which does business as Schagrin Associates, is a law firm founded in 1984 and located in the District of Columbia. Schagrin Associates has represented members of the U.S. steel, steel pipe, and other industries in hundreds of AD/CVD administrative proceedings, court appeals, and related customs investigations.

12.     Relator Roger B. Schagrin is the president and sole owner of Schagrin Associates. He has over 30 years of experience representing members of the U.S. steel pipe and tube industry in international trade matters. Mr. Schagrin has personally drafted the "scope" sections describing the product coverage of nearly all of the AD/CVD petitions filed by the steel pipe and tube industry over the last 30 years, including the AD/CVD petitions regarding CWP from China that led to the orders involved in this proceeding. Mr. Schagrin continues to represent members of the U.S. industry in reviews of these orders and their enforcement. He also represents U.S. steel pipe producers in customs matters regarding the proper classification of steel pipe and tube imports under the Harmonized Tariff System of the United States ("HTSUS" or "HTS"). As part of his representation, Mr. Schagrin has worked closely for decades with industry executives to describe the technical characteristics of their products, their manufacturing methods, their conditions of competition, and their financial performance, and has testified about these matters under oath in hundreds of administrative proceedings before the U.S. International Trade

Commission ("ITC"). Accordingly, he is an expert in the classification of steel pipe products under the HTSUS and the coverage of AD/CVD orders in this industry.

13.     This Complaint is not based on a public disclosure as set forth in 31 U.S.C. § 3730(e). The transactions alleged herein cannot be found in "public disclosures" as that term is defined under the FCA. Rather, Relators discovered LDR's fraud through their own product observations and the piecing together of information that itself did not reveal LDR's fraud. In any event, Relators bring this action as the original source of information regarding Defendants' violations of the False Claim Act, given that Relators disclosed the allegations herein to the Government through the filing of e-allegations and meetings with Customs import specialists and agents, which led to CBP issuing a bill to LDR for unpaid AD/CV duties owed. Relators have direct and independent knowledge of the information on which the allegations contained herein are based and/or knowledge that is independent of and materially adds to any allegations or transactions that were publicly disclosed, and Relators voluntarily provided the information on which this action is based to the Government before filing this action.

14.     Defendant LDR was reportedly founded in the 1930s. It is headquartered at 600 N. Kilbourn Ave., Chicago, IL. LDR sells its pipe and pipe fittings at various retail stores, such as Home Depot, throughout the United States. LDR uses its wholly-owned subsidiary, LDR International, Inc., based in Taiwan, to source, assemble, and package its products. LDR's other wholly-owned subsidiary, Starlion International Co., Ltd., is a holding company for SLK Hardware Co., Ltd, a China-based exporter that is a significant supplier to LDR. Although LDR filed for Chapter 11 bankruptcy in or about September 2014, both of these LDR subsidiaries continue to operate its business in the ordinary course and have not sought bankruptcy relief.

15. Defendant GB Holdings was reportedly incorporated in the late 1990s. It is the parent company and sole member of LDR. Like LDR, GB Holdings is headquartered at 600 N. Kilbourn Ave., Chicago, IL.

16. LDR has operated as the alter ego of GB Holdings for purposes of committing the fraud alleged herein. As the sole member of LDR, GB Holdings exercises complete discretion over the decisions of LDR. LDR and GB Holdings also share common office space, addresses, and phone numbers as both companies are headquartered in the same location. In addition, there is overlap in ownership, officers, and personnel between the companies, with the owners of GB Holdings, Larry Greenspon and Dennis Greenspon, also serving as the managers of LDR. Furthermore, GB Holdings has not adequately capitalized LDR given that in or about September 2014, LDR filed for Chapter 11 Bankruptcy, in which LDR admitted that it was so undercapitalized that it did not have sufficient funds to pay the full amount of customs duties owed on its imports. Piercing the corporate veil of LDR is thus appropriate and warranted due to, *inter alia*, the disregard of corporate formalities, as evidenced by, for example, the under capitalization of LDR and the fact that ultimate control and management over LDR is vested in GB Holdings, and Defendants' use of the corporate form to commit fraud on the U.S. Government. Refusing to pierce the veil of LDR would thus sanction Defendants' fraud and promote injustice.

17. Defendants Larry Greenspon and Dennis Greenspon are the sole owners of GB Holdings and also served as the managers of LDR. Larry Greenspon reportedly founded LDR and, until on or about April 2013, served as its Chief Executive Officer. Defendant Dennis Greenspon identifies himself as having been an owner of LDR since September 1973.

Defendant Larry Greenspon is presently a resident and citizen of Longboat Key, FL and/or Marshall, NC. Defendant Dennis Greenspon is a resident and citizen of Highland Park, IL.

18. At all times relevant hereto, the Greenspons knew that AD/CV duties and marking duties were owed on LDR's pipes by virtue of their long-term and high-level involvement in LDR, from which they gained significant knowledge and experience in the piping industry and import business. Yet, despite this knowledge, the Greenspons improperly concealed and directly facilitated LDR's evasion of the AD/CV duties and marking duties owed by the company through their ownership and control of GB Holdings and LDR. The Greenspons furthermore directly caused the submission of false records and statements material to LDR's obligation to pay AD/CV duties and marking duties.

19. In addition, GB Holdings and, by extension, LDR operated as the alter egos of the Greenspons for purposes of committing the fraud alleged herein. The Greenspons exercised complete discretion over the decisions of GB Holdings and LDR by virtue of their sole ownership of GB Holdings, which is the sole owner of LDR, as well as their position as managers of LDR. The Greenspons even own 600 N. Kilbourn, L.L.C., from which LDR leases its principal offices, with 600 N. Kilbourn Ave., Chicago, IL serving as the headquarters for both LDR and GB Holdings. In essence, the Greenspons created GB Holdings and other companies, like 600 N. Kilbourn, L.L.C., as shell companies for purposes of funneling their ill-gotten gains.

20. Via the above-described ownership structure, the Greenspons extracted substantial sums of money from GB Holdings and LDR, amassing considerable personal wealth by depositing into the Greenspons' personal funds the unlawfully gained profit LDR obtained through fraudulently evading AD/CV duties, and leaving LDR so undercapitalized that the company does not have sufficient cash to pay the full amount of customs duties owed to the U.S.

Government on its imports. Instead, the Greenspons caused and expressly authorized LDR to file for bankruptcy in order to avoid having to pay these AD/CV duties.

21. Indeed, the Greenspons structured GB Holdings and LDR specifically to serve as a vehicle for fraud and have taken so much money out of LDR that it cannot operate as a legitimate, duty-paying company, despite LDR's admission that for most of its existence, LDR has been a profitable company. Piercing the corporate veil of GB Holdings is thus appropriate and warranted due to, *inter alia*, the disregard of corporate formalities, as evidenced by, for example, the fact that ultimate control and management over GB Holdings, and by extension LDR, was vested in the Greenspons, and the Greenspons' use of the corporate form to commit fraud on the U.S. Government. Refusing to pierce the veil of GB Holdings would sanction the Greenspons fraud and promote injustice.

22. The United States is named herein as a Plaintiff as the real party in interest pursuant to the False Claims Act, 31 U.S.C. §3729, *et seq*.

## JURISDICTION AND VENUE

23. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. §§ 3730(b), 3732.

24. This Court has general and specific personal jurisdiction over Defendants by virtue of Defendants residing and/or regularly transacting business in the State of Illinois, the latter of which serves as the basis for Plaintiff's Complaint.

25. Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732 because Defendants are located within this District, and/or a substantial amount of the false and fraudulent acts complained of herein took place in this District.

## FACTS

26.     Each of the foregoing paragraphs are incorporated by reference as if fully set forth herein.

**LDR's Chinese Standard Pipe was Subject to Antidumping and Countervailing Duties**

27.     Antidumping and countervailing duties are intended to remedy the sale of foreign imports for less than their normal value (referred to as "dumping") or that benefit from foreign government subsidies.  Such practices are widely considered to have distortive effects on international trade.  AD/CV duties thus provide relief to U.S. industry from these unfair trade practices.

28.     Commerce began requiring companies to post CV duty bonds on CWP imports from China starting in or about November 2007 and began requiring AD bonds on the same in or about January 2008.  In June 2008, Commerce issued final AD/CV determinations and imposed final AD/CV Orders.  Final AD rates were set at 69.2% to 85.55%, which were added to CV rates of between 29.57% and 615.92%, depending on the manufacturer.  Thus, all imports of CWP from China were initially subject to total AD/CV duties of 99% or more.  Thereafter, in or about 2012, Commerce slightly reduced the amount of AD/CV duties it collects on CWP imports from China to between 45.35% and 68.24% (for AD duties) and 29.83% to 620.08% (for CV duties).

29.     The "scope" of the CWP AD/CVD Orders determines what products they cover. The scope encompasses all circular pipe of 0.372" to 16" outside diameter made of carbon steel, *i.e.*, not containing high quantities of alloying elements such as chromium or nickel.  Most such "standard" pipe is made to ASTM standards A-53 (standard specification for welded and seamless steel pipe), A-135 (electric resistance welded steel pipe), or A-795 (standard steel pipe for fire protection purposes).  Standard pipe may also be made to "structural" (load bearing) pipe

specifications A-252 (welded and seamless steel pipe piles) and A-500 (cold-formed welded and seamless structural tubing).  However, steel pipe need not conform to any of these specifications to be covered by the CWP AD/CVD Orders.

30.     Rather, the AD/CVD Orders cover all types of welded carbon steel pipe from China within the given range of diameters, except seven specifically excluded types.  The scope does not include: (a) pipe suitable for use in boilers, superheaters, heat exchangers, condensers, refining furnaces and feedwater heaters, whether or not cold drawn; (b) mechanical tubing, whether or not cold-drawn; (c) finished electrical conduit; (d) finished scaffolding; (e) tube and pipe hollows for redrawing; (f) oil country tubular goods produced to API specifications; and (g) line pipe produced to only API specifications.

31.     Prior to the CWP AD/CVD Orders, imports from China accounted for a large and growing share of the U.S. CWP market.  U.S. imports of Chinese CWP, for example, increased from 382,122 short tons in 2005 to 748,181 short tons in 2007, and their share of the U.S. CWP market increased from 16.2% in 2005 to 29.0% in 2007.  Almost immediately after duties were imposed, however, reported CWP imports from China essentially disappeared from the U.S. market.  In 2009, for example, the United States imported only 2,813 short tons from China in the relevant CWP HTS categories, representing only 0.6% of U.S. CWP consumption.  Reported imports from China in these categories were similarly nonexistent in the following years as well (between 0.6% and 0.7% of the U.S. market).

**LDR Unlawfully Evaded AD/CV Duties Owed on Its Chinese Standard Pipe**

32.     In November 2010, Relator Schagrin visited a Home Depot store in Annapolis, Maryland.  There, he saw threaded black and galvanized steel pipe for sale in the plumbing

supply section.[1]  Paper labels glued to the pipe barrel identified this pipe as an LDR product

made in China.  The products were in standard pipe lengths greater than one foot and standard

pipe nominal diameters from ½" to 1 ¼".

33.     Mr. Schagrin knew that standard CWP imports from China at that time (at least as

reported by importers to CBP) had fallen to zero or near zero.  Based on his experience,

Mr. Schagrin was of the opinion that the LDR pipe for sale at Home Depot did not fall into any

of the exceptions to the scope of the AD/CVD Orders.  In fact, he was aware that the same stores

had carried the same products from LDR at the same prices prior to the imposition of AD/CV

duties on standard CWP pipe from China.

34.     Firstly, Home Depot's plumbing supply section would normally sell low-value,

standard pipe for use in plumbing supply and small construction projects, not any of the

specialized and generally more expensive products covered by the AD/CVD scope exclusions.

Moreover, none of the products were labeled or marketed as boiler, mechanical, or other tubing

subject to these exceptions.

35.     Further, based on visual inspection, none appeared to fit the physical description

of the products subject to the AD/CVD scope exclusions.  Since the LDR pipe was labeled and

sold to standard pipe dimensions, for example, it would not qualify for treatment as specialized,

made-to-order mechanical tubing, and it would be unlikely that anyone manufacturing or

servicing mechanical devices would buy significant quantities of inputs in the Home Depot

plumbing supply section.

---

[1]     Black pipe refers to steel pipe with a black lacquer coating to resist rust.  Galvanized pipe
is electroplated with zinc for additional protection.

36.     In addition, the LDR pipe was not stenciled or labeled as boiler tubing pursuant to ASTM standards, and, again, it would be dangerous for anyone building or servicing boilers, superheaters, or similar products to buy unlabeled products from Home Depot.  It was also improbable that such products would be for sale at Home Depot, which stocks low-priced, standardized plumbing supplies.

37.     The LDR pipe also obviously lacked the physical characteristics of electrical conduit and finished scaffolding, and did not bear any of the stenciling or labeling required for API products.  Similarly, it would be very unlikely that manufacturers would buy pipe at Home Depot for redrawing, and in any event the pipe also met standard pipe specifications and thus would likely be considered to be standard pipe regardless of its ultimate use.

38.     Accordingly, Mr. Schagrin determined that the LDR pipe being sold was standard pipe subject to the AD/CVD Orders on CWP pipe from China.  In addition, he was certain that the importer was not paying these duties because little or no pipe from China was being reported as imports in the HTS categories subject to the duties, and because the duty rates were so high that it would be uneconomical to import low-grade pipe in any quantity while paying the duties. Thus, Mr. Schagrin inferred that LDR was avoiding paying the AD/CVD duties applicable to the pipe sold in Home Depot by inaccurately reporting its imports in the wrong HTS categories.

39.     In the same way that Mr. Schagrin was able to identify LDR's fraud, it should have been obvious to anyone with sufficient knowledge of and experience in the pipe and pipe fitting industry that LDR's standard pipe imports from China were subject to the CWP AD/CVD Orders and not properly labeled with their country of origin.

40.     The Greenspons have such knowledge and experience given their many decades in the piping industry and import business as owners and/or high-level officials of LDR, which

evidences that they actively, knowingly, and intentionally participated in LDR's fraudulent scheme to evade customs duties as alleged herein. The Greenspons furthermore directly perpetuated LDR's evasion of the AD/CV duties and marking duties through their ownership and control of GB Holdings and LDR, including by directly causing the submission of false customs records and statements material to LDR's obligation to pay AD/CV duties and marking duties and/or causing the omission of material information from the same.

41.     The substantive knowledge and experience of the Greenspons, both of the pipe fitting industry and import business more generally, as well as LDR's specific business dealings, is confirmed in documentation submitted to the U.S. Department of Commerce and in various court filings by LDR and the Greenspons, as well as by witness testimony.

42.     For example, in the United States International Trade Commission matter captioned *In re Malleable Iron Pipe Fittings from the People's Republic of China*, Inv. No. 731-TA-1023, Larry Greenspon submitted an affidavit, in which he holds himself out as President of LDR Industries, Inc. and describes the company as a "family-owned business" that "has been in the same business for over 50 years" of "distribut[ing] plumbing products, including faucets, fittings, valves, bathware, and other plumbing-related supplies." *See* Ex. 2 at ¶¶ 1-2.

43.     He then offers testimony based on his admitted "personal knowledge" of LDR's import business, namely that "LDR buys its products from foreign manufacturers and also from U.S. sources and distribute[s] them mainly to large national home center chains." *Id*. at ¶ 1, 3. He further goes into specifics regarding a former affiliate of LDR, the products it sold, the habits of its customers, and the interrelations of the two companies. Larry Greenspon offered up this cumulative experience in the pipe fitting industry as support for his conclusion that imported

Chinese malleable pipe fittings do not compete with U.S.-made malleable pipe fittings in the wholesale market selling to contractors. *Id*. at ¶¶ 4-5.

44.     In short, this affidavit serves as an admission by Larry Greenspon that he considers himself as having considerable experience in the pipe fitting industry and Chinese import business, as well as involvement in LDR's purchasing and sales practices, such that he would have known about LDR's fraudulent misclassification of its standard pipe imports.

45.     Likewise, in LDR's Chapter 11 bankruptcy proceedings, LDR represented to the court that Dennis and Larry Greenspon had agreed to enter into non-competition and consulting agreements with the contemplated buyer of LDR pursuant to a Purchase Asset Agreement, whereby the Greenspons would "provide assistance in connection with the continued operation of the business, transition assistance with suppliers and customers, and minimizing any disruption in the operation of the business following the closing." *See* Ex. 3, *In re LDR* (Dkt. 118 at 6-7, ¶ 17). In other words, LDR held out the Greenspons as the primary individuals with knowledge as to how LDR operated, as well as to the specifics regarding LDR's suppliers and customers.

46.     Indeed, the Purchase Asset Agreement entered into by LDR lists Dennis and Larry Greenspon as two of only four individuals with "Knowledge of [LDR]." And unlike the two other individuals, whose knowledge is subject to "reasonable inquiry of their immediate subordinates," the knowledge of Dennis and Larry Greenspon is not so predicated. *See* Ex. 3, *In re LDR* (Dkt. 118-1 at 9) (defining "Knowledge of the Seller"). That is because Dennis and Larry Greenspon were the two individuals at LDR with the ***most*** knowledge of the company's business dealings and import practices, such that it is inconceivable they would not have known of and facilitated LDR's fraudulent duty evasion.

47.     In LDR's Chapter 11 bankruptcy proceedings, LDR's Chief Executive Officer also submitted a declaration identifying Larry and Dennis Greenspon as the managers of LDR. *See* Ex. 4 at ¶ 2, *In re LDR* (Dkt. 12) (referred to herein as the "Underwood Declaration"). And in response to a questionnaire by the U.S. Department of Commerce in connection with an administrative review of an AD order on Chinese pipe fittings, LDR's Chinese subsidiary, SLK, certified that LDR's managers were those with "authority to contractually bind LDR to sell merchandise," meaning that Larry and Dennis Greenspon would have been involved in the contractual negotiation of pipe fitting sales to LDR's customers, including Home Depot, where Mr. Schagrin observed the LDR Chinese CWP pipe he reported to CBP. *See* Ex. 5 at A-3.

48.     In addition, in this same response, SLK also certifies that "[m]ost of LDR's customers [we]re retailers of plumbing products" (*id*. at A-16), which is consistent with Larry Greenspon's aforementioned affidavit, in which he testifies that LDR's business was the distribution of plumbing products "mainly to large national home center chains" (Ex. 2 at ¶ 3). In other words, LDR had a relatively small line of products and customers to which it sold. Moreover, by virtue of the Greenspons' involvement in the sale of LDR's pipe to big box retailers of plumbing products, like Home Depot, the Greenspons necessarily would have known that the pipe they were selling was not boiler tube.

49.     The Underwood Declaration also states that as of September 2014, LDR employed only 90 people, the majority of which were paid on an hourly basis, with only 39 salaried employees. Ex. 4 at ¶ 14. According to the same, LDR's annual net sales were approximately $65 million (with annual revenue of approximately $37 million) in the years leading up to its bankruptcy, the bulk of which according to SLK was plumbing products. *Id*. at

¶ 17. The Underwood Declaration further notes that "LDR's key employees have an average tenure of approximately 20 years with a low turnover rate." *Id*. at ¶ 15.

50.     LDR was thus a relatively small company with a relatively limited line of products compared to other pipe fitting importers in the industry. As a point of comparison, Zekelman Industries, Inc., the largest domestic producer of CWP, and a competitor of LDR, also based in Chicago, Illinois, employs approximately 2,300 employees (compared to LDR's 90) and recently reported $2.6 billion in net sales, of which it attributed 15% (or $390 million) to plumbing pipe sales by its Wheatland brand. *See* Zekelman Industries Inc., U.S. Securities and Exchange Commission Registration Statement, Registration No. 333, Form S-1 (Aug. 17, 2018) at 2; *available at*

https://www.sec.gov/Archives/edgar/data/1742916/000119312518251560/d592991ds1.htm.

Zekelman's plumbing sales alone are thus approximately six times LDR's, with its total net sales exceeding LDR's by 40 times.

51.     In sum, the above-described documentation outlining the Greenspons' responsibilities at LDR and their experience in the industry, as well as LDR's plumbing customer base and relatively small size, undoubtedly demonstrates that the Greenspons were not just managers, but active and principal managers of LDR. This is not the case of a large company with a vast array of product lines and far-removed managers who might not have had occasion to learn about or be involved in fraud relating to a small product line. This is the case of a relatively small family-owned company principally run by two brothers who managed every material aspect of the business and given their knowledge, experience, and responsibilities necessarily would have known of and participated in the fraud alleged herein.

52.     Indeed, a former employee of LDR, who worked with the Greenspons as LDR's marketing manager from 1999-2005, has come forward since the public filing of Relators' First Amended Complaint and stated that the Greenspons controlled every aspect of LDR's business and that he ultimately left the company because of the Greenspons' shady business practices.

**Relators Reported LDR's Customs Fraud to the U.S. Government**

53.     On or about November 16, 2010, Mr. Schagrin notified CBP via an electronic E-Allegation, case number e101116441984633, that LDR was selling Chinese CWP pipe to Home Depot nationwide by falsely classifying the pipe under other HTS categories and thereby evading AD/CV duties.  Schagrin Associates thereafter spoke in person with CBP representatives and provided pictures of the pipe at issue.

54.     Following the provision of this information by Relators, CBP Field Operations at the Port of Chicago investigated the matter with assistance from Relators.  As part of its investigation, in or about July 2012, CBP identified a shipment of welded pipe that LDR had classified under HTS 7306.30.50.10 and claimed was boiler tube.  CBP relayed this information to Schagrin Associates, who arranged, at CBP's request, for a pipe industry expert to examine the pipe.

55.     This expert determined that the pipe samples obtained by CBP from this shipment had threaded ends, whereas boiler tubes typically do not because they expand and contract in the boiler depending on temperature.  In addition, boiler tubes are usually the same length as the boiler, but the LDR pipe obtained by CBP had lengths of 18" or 24," too short to be practical for such use.  CBP forwarded this information and the pipe itself to a laboratory to confirm definitively that the pipe did not meet the ASTM A-178 boiler tube technical specifications and had thus been misclassified.

56.     On or about October 2012, Schagrin Associates purchased LDR pipe from a Home Depot in the United States.  Like the pipe Mr. Schagrin had purchased in Maryland in 2010, this pipe was also labeled as a product of China and had the physical characteristics of standard pipe subject to the AD/CVD Orders.  Schagrin Associates provided this pipe personally to CBP officials and explained both that it was standard pipe subject to the CWP AD/CV Orders and that the country-of-origin marking on the pipe was not compliant with U.S. law.

57.     Through its investigation, CBP has concluded, in agreement with Relators, that LDR has imported standard pipe subject to CWP AD/CV duties without paying the applicable duties by falsely classifying the pipe under the wrong HTS category.  Indeed, CBP sent LDR a bill in the amount of $6.7 million (which was later reduced to approximately $4.85 million) for unpaid AD/CV duties relating to its misclassified CWP pipe covering shipments from 2011 and 2012.

58.     During Chapter 11 bankruptcy proceedings that were subsequently initiated by LDR to avoid paying these AD/CV duties, CBP identified even more fraud by LDR. Specifically, in the bankruptcy proceedings, CBP submitted an unsecured proof of claim of over $58 million comprised of loss of revenue, fines, and penalties, in which CBP identified close to $20 million of AD/CV duties that LDR had fraudulently evaded. *See* Ex. 1.

**LDR Knowingly and Intentionally Evaded AD/CV Duties By Making False Statements to the U.S. Government And Otherwise Concealing the Amount of Duties Owed**

59.     In sum, LDR sold large quantities of Chinese standard pipe to Home Depot since at least 2010, while intentionally and unlawfully evading applicable AD/CV duties on the same by misclassifying its imports under the wrong HTS categories and falsely declaring to CBP that it owes no AD/CV duties.

60. Once an antidumping or countervailing duty order is in place, the importers of any products subject to the order are required to declare and deposit with CBP the applicable AD/CV duties.

61. On or about the time of importation, an importer is required to file certain "entry documents" with CBP, which among other things, must enable CBP to "properly assess duties on the merchandise" and "determine whether any other applicable requirement of law . . . is met." 19 U.S.C. § 1484(a)(1)(B). As part of an importer's entry package, an importer must also submit any other documents necessary to determine merchandise admissibility.

62. An importer is required to use "reasonable care" to file with CBP "such documentation or . . . information as is necessary to enable the Bureau of Customs and Border Protection to determine whether the merchandise may be released from custody of the Bureau of Customs and Border Protection." 19 U.S.C. § 1484(a)(1)(A). In addition, an importer must use "reasonable care" to file "with the Customs Service the declared value, classification and rate of duty applicable to the merchandise, and such other documentation or . . . information as is necessary to enable the Customs Service to—(i) properly assess duties on the merchandise, (ii) collect accurate statistics with respect to the merchandise, and (iii) determine whether any other applicable requirement of law ([in addition the] requirement relating to release from customs custody) is met." 19 U.S.C. § 1484(a)(1)(B).

63. In addition to filing entry documents, importers must also deposit estimated duties, fees, charges, and exactions owed with CBP on or about the time of importation. 19 U.S.C. § 1505(a), 19 C.F.R. § 141.103.

64. Entry documents usually include an entry summary, such as CBP Form 7501 or its electronic equivalent, which requires an importer to describe, among other things, the country

of origin, the value of the merchandise, the tariff classification, and the importer's estimate of the correct amount of duties, fees, and other charges and exactions.

65.     Block 2 in Form 7501 requires an importer to designate the type of goods being imported, with certain codes required to be used for goods subject to AD/CV duties.  Blocks 29 and 33 in Form 7501 further requires an importer to fill in information relating to the proper HTS classification and AD/CV duties owed, while Block 29 requires an importer to record the "total estimated AD/CVD or other fees, charges or exactions paid."

66.     The amount of duties deposited represents the importer's estimate of how much money it owes, but because entries often automatically "liquidate" by statute at the duty rate estimated by the importer, any false information or omissions in entry documents will directly cause customs duties not to be paid.  *See* 19 U.S.C. § 1504(a); 19 C.F.R. § 159.11.

67.     With respect to each import of its Chinese standard pipe, LDR knowingly misclassified the pipe in its customs entry forms by falsely reporting to CBP that it was boiler tube or other products exempt from AD/CV duties.  LDR also intentionally misrepresented that it owed no AD/CV duties on this pipe.

68.     Consequently, Defendants routinely made or used, or caused to be made or used, false and fraudulent records and statements material to LDR's obligation to pay AD/CV duties to the U.S. Government, an obligation that Defendants further knowingly concealed and knowingly and improperly avoided or decreased, in violation of the FCA, 42 U.S.C. § 3729(a)(1)(G).

69.     Defendants thus regularly and systematically violated the FCA.  Defendants further did so "knowingly" as defined in § 3729(b) of the Act.

70.     LDR knew, for example, that its standard pipe imports were plainly subject to the CWP AD/CVD Orders because they do not meet the ASTM A-178 boiler tube requirements, and

they were obviously unsuitable—indeed, quite dangerous—for boiler tube use, or use as any other product excepted from the AD/CVD Orders.

71.     Indeed, LDR and its executives were perfectly aware of the uses to which its pipe was destined given that LDR sold large quantities of this pipe to Home Depot, which is a general-purpose plumbing and construction retailer ubiquitous in the United States, including the Chicago area, and which is not a distributor or end-user specializing in boiler manufacture or service. As certified by LDR's Chinese exporter in response to the antidumping questionnaire discussed above, "[m]ost of LDR's customers [we]re retailers of plumbing products." *See* Ex. 5 at A-16. Thus, anyone with knowledge of LDR's customers, like the Greenspons, would have known that the Chinese pipe it was marketing and selling to these customers was CWP, not boiler tube, which is not a plumbing product and would not be purchased at a Home Depot. Indeed, no U.S. manufacturer of boilers would use A-53 pipe in a boiler.

72.     In fact, in July 2012, LDR's Vice President of Finance, David Pollans, requested an administrative review of the AD order pertaining to Chinese CWP, in which Mr. Pollans certified that LDR was importing CWP pipe subject to the AD order. *See* Ex. 6. That is because LDR ***was*** importing Chinese CWP pipe subject to the AD order. Yet, in response, the U.S. Department of Commerce informed LDR that it had no record of LDR importing Chinese CWP pipe during the period of review and requested evidence of such importation. *See* Ex. 7. The U.S. Department of Commerce could find no such records because LDR had been fraudulently misclassifying the pipe as boiler tube since the imposition of AD/CV duties. In reply, LDR withdrew its administrative review request without explanation. *See* Ex. 8. There is thus no question that as of September 2012, LDR was definitively put on notice that it had been evading

AD duties by importing misclassified Chinese CWP pipe. Instead of paying these duties, LDR knowingly continued its fraudulent duty evasion.

73. The Greenspons, however, knew much earlier that LDR was committing this fraud given their extensive knowledge, experience, and involvement in LDR's business dealings. Indeed, the unusual administrative review request and withdrawal by LDR's Vice President of Finance, who the Underwood Declaration describes as part of LDR's "core management team" (Ex. 4 at ¶ 2), provides additional evidence that the Greenspons were most likely **the** individuals responsible for (and likely two of very few individuals with initial knowledge of) LDR to evade AD/CV duties by fraudulently reclassifying LDR's Chinese CWP pipe as boiler tube.

74. Through the commission of this fraud, LDR was able to save substantial money by avoiding AD/CV duties on its standard Chinese CWP, which range from approximately 80 percent to over 600 percent of the dutiable value of the product, providing a strong incentive to commit fraud. And the Greenspons were the individuals who profited most from the scheme.

**LDR Also Evaded Marking Duties Owed On Its Chinese Standard Pipe**

75. In addition to LDR's fraudulent evasion of AD/CV duties, LDR also knowingly imported pipe from China without proper country-of-origin markings, which automatically imposes an obligation on LDR to pay certain customs duties, namely, what are referred to as "marking duties" in the amount of 10% of the value of the unmarked imports.

76. For almost a century, Section 304 of the U.S. Tariff Act of 1930 (the "Tariff Act"), 19 U.S.C. § 1304(a), has required imported iron and steel pipe and pipe fittings to be "marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article."

77.     In 1984, Congress added a specific, stringent rule governing the marking of pipe and pipe fittings made from steel, cast iron, or malleable iron in recognition of the fact that "[t]here appears to have been significant evasion of the law with regard to these articles." S. Rep. No. 98-308 at 32 (Nov. 10, 1983).  As amended, the Tariff Act, 19 U.S.C. § 1304(c), now specifically requires that the country of origin of such pipe and pipe fittings must be marked in one of five ways:  die stamping, cast-in-mold lettering, etching, engraving, or continuous paint stenciling, or, if all of these methods are "technically or commercially infeasible," the pipe and pipe fittings may be marked by "an equally permanent method of marking."  Unlike other products, no exception can be made to the country-of-origin marking requirements for imported iron and steel pipe and fittings, such as LDR's Chinese CWP.

78.     Under the Tariff Act, 19 U.S.C. § 1304(i), goods that are not properly marked with their country-of-origin are subject to a special category of customs duties, referred to as "marking duties," which are assessed at "10 per centum ad valorem."  By the plain language of the statute, these marking duties "shall be deemed to have accrued at the time of importation, shall not be construed to be penal, and shall not be remitted wholly or in part nor shall payment thereof be avoidable for any cause."  An importer is personally liable for these duties.

79.     Marking duties serve both to promote compliance with making requirements and help ensure that incorrect designations of country of origin do not reduce U.S. customs revenue, given that duty rates generally depend, in part, on the country of origin of imports.

80.     LDR knowingly and intentionally disregarded country of origin marking requirements, in plain violation of black letter law.  None of LDR's pipes or pipe fittings observed or purchased by Relators were stenciled, engraved, or otherwise permanently and properly marked with their country of origin.  Rather, at the point of sale, LDR's pipes had only

small paper labels identifying them as foreign made, which are not permanently attached to the product, or, in the case of LDR's pipe fittings, were enclosed in plastic bags printed with the name of the country of origin, both of which are in violation of U.S. customs law.

81.     These violations, moreover, are not trivial.  Use of paper labels, plastic bags, and other impermanent methods not permitted by in U.S. law facilitates two types of fraud.  First, by designating a false country of origin, improperly marked products can deceive inspectors and competitors trying to monitor trade flows and compliance with AD/CVD Orders, not to mention ordinary duty requirements.

82.     For example, in many cases, LDR's threaded pipe is shipped with plastic thread protectors screwed on to each end (to protect the threads during shipping), which are imprinted with a county-of-origin that often does not match the country on the paper label affixed to the threaded pipe.  For instance, the paper labels on LDR's pipes often say "Korea," whereas the thread protectors say "China."  Neither method of marking complies with the Tariff Act, but the deviance supports the conclusion that LDR's pipes labeled "Korea" were actually made in China and are thus subject to AD/CV duties.

83.     Second, many regulations and government contracts require American-made components to be used for government-funded projects.  For example:

        a.      The Buy American Act, 41 U.S.C. § 10a-10d, requires that all products purchased by the federal government (with certain exceptions) be made in the United States.

        b.      Many "Little Buy American Act" laws require at least some percentage of U.S.-made products for specific types of projects funded with federal money, including airports, transport projects, and water treatment plants, or paid for by certain entities such as Amtrak and USAID.

c.     Section 1605 of the American Recovery and Reinvestment Act of 2009 (the so-called "stimulus" law) ("ARRA") requires that iron and steel manufactured goods used in funded projects be made in the United States.

84.     Since paper labels can be easily removed, contractors working on projects that require U.S.-made materials can purchase foreign-made pipe and fittings, remove the labels and escape detection, providing an additional motive for fraud.

85.     LDR thus had a clear motive for concealing the Chinese origin of its products. Korea has signed the WTO Agreement on Government Procurement, making Korean pipe eligible to be included in Buy American Act projects, whereas Chinese pipe is not.  Even if the Korean-marked labels were left on LDR's pipes, the Chinese-marked thread protectors are removed when the pipe is installed, so there would be no way for government inspectors to monitor whether contractors had used compliant pipe.

### LDR Knowingly and Intentionally Evaded Marking Duties By Making False Statements to the U.S. Government And Otherwise Concealing the Amount of Duties Owed

86.     CBP is charged with monitoring and enforcing U.S. trade laws and customs regulations regarding the importation of foreign goods.  CBP collects customs duties, including marking duties.  It is not permissible, however, to distribute improperly marked goods into the stream of commerce, even if marking duties are paid.  If CBP detects a marking violation, it will seek to require proper marking, destruction, or re-export of the items in question.  19 C.F.R. §§ 134.3, 134.51(a).  When distribution into the U.S. stream of commerce of improperly marked pipe occurs, marking duties become due by operation of law upon importation.  19 U.S.C. § 1304(i).

87.     Because LDR's pipes and pipe fittings were not properly marked with their countries of origin at the time of importation and distribution into the stream of commerce, LDR is liable for an additional 10% marking duty with respect to its improperly marked pipe imports.

88.     Importers have a duty to disclose marking violations and marking duties at the time of importation.  LDR was successfully (albeit unlawfully) able to import its improperly marked Chinese standard pipe into the United States by knowingly failing to pay or disclose to CBP the marking duties the company owes.  LDR commits this fraud on the U.S. Government by, among other things, falsifying its entry documents and otherwise concealing the improperly marked nature of its pipe such that CBP will not detect the company's fraud.

89.     If an importer timely and accurately discloses to CBP that imported goods are improperly marked, CBP will require an importer to properly mark, destroy, or re-export the items, even if marking duties are paid.  In other words, the mere fact that LDR was selling improperly marked foreign goods in the United States establishes almost conclusively that LDR falsified its customs documents.

90.     However, if an importer, such as LDR, imports goods that are not properly marked with their country of origin, the chances that CBP will discover the violation is miniscule.  CBP physically inspects only a tiny fraction of shipments arriving in the United States (approximately 1-2%), and the inspections that CBP does conduct necessarily tend to focus primarily on security and law enforcement matters rather than tariff requirements.  Shipments by a major manufacturer may almost never be subject to physical inspection, and even if they are, only a tiny portion of the contents of a sealed shipping container would likely be examined.  CBP thus rarely catches marking violations or collects marking duties.  Rather, the

vast majority of goods that are imported without proper country-of-origin markings simply enter the United States without detection by CBP.

91.     An importer's duty to disclose marking violations and marking duties arises from (a) the plain language of 19 U.S.C. § 1304(i), which requires any exportation, destruction, or marking of unmarked goods to "be accomplished under customs supervision;" (b) the 1993 North American Free Trade Implementation Act (Customs Modernization Act), Pub. L. No. 103-82, 107 Stat. 2057 (1993) ("Mod Act"), which implemented an "informed compliance" regulatory regime under which importers must ensure Customs is provided with accurate and timely information pertaining to imports; (c) 19 U.S.C. § 1484, which implements the requirement of "informed compliance" by expressly requiring an importer to provide information to Customs sufficient to show that imports comply with any "applicable requirement of law" and "may be released" from Customs custody and that enables Customs to "properly assess duties on the merchandise;" and (d) 19 U.S.C. § 1592, which makes clear that omissions relating to marking are material and thus marking violations and/or estimated marking duties are unquestionably encompassed within the type of information that 19 U.S.C. § 1484 requires to be disclosed at the time of entry.

Requirement to Correct Marking Violations "Under Customs Supervision"
Pursuant to 19 U.S.C. § 1304(i)

92.     All imports are legally considered in CBP's custody upon arrival, but typically are immediately, albeit conditionally, released under bond absent any import issue. Unmarked goods, however, must be marked, exported or destroyed "under customs supervision," 19 U.S.C. § 1304(i), either before delivery, or, if an importer takes immediate delivery under bond (as usually occurs), upon actual or constructive redelivery to CBP custody. Even if unmarked goods are exported or properly marked prior to liquidation, marking duties will accrue if such

exportation or marking does not occur "under customs supervision."  19 U.S.C. § 1304(i); *see also, e.g.*, *Frontier Ins. Co. v. United States*, 185 F. Supp. 2d 1375, 1379 (Ct. Int'l Trade 2002); Customs Ruling, HQ H077355, 2009 WL 5488688 (Oct. 28, 2009); Customs Ruling, HQ 735472, 1994 WL 896594, at *3 (July 8, 1994) ("Remarking of merchandise alone is not sufficient to cancel an assessment of marking duties; it must be done under Customs supervision.").  Importers thus have an obligation to work with CBP to ensure proper marking of goods and must disclose to CBP when imports arrive unmarked.

93.     CBP has discretion to require goods to be marked under its physical supervision at a bonded warehouse or Foreign Trade Zone or to conditionally release the merchandise for marking at a location of the importer's choosing, in which case the importer must provide a certificate of marking and receive notification from CBP that the marking is acceptable.  *See Frontier*, 185 F. Supp. 2d at 1379; Customs Ruling, HQ 734282, 1992 WL 313523 (Feb. 10, 1992) (citing 19 C.F.R. § 134.51, 134.52); *see also* Customs Ruling, HQ 734291, 26 Cust. B. & Dec. 406, 1991 WL 537178 (Aug. 26, 1991); Customs Ruling, HQ 733856, 25 Cust. B. & Dec. 307, 1991 WL 544155 (Mar. 8, 1991).

94.     This certification process is initiated via issuance by CBP of a Notice to Mark (CBP Form 4647), which informs the importer that merchandise cannot be distributed into the stream of commerce until CBP authorization is received and the importer is notified by CBP that the corrective action taken is acceptable.  *See, e.g.*, *Frontier*, 185 F. Supp. 2d at 1379-80; *see also* 19 C.F.R. § 134.51, 134.52.  Accordingly, however CBP chooses to proceed, when goods arrive in U.S. customs territory unmarked, an importer unquestionably must obtain CBP authorization to correct the problem and enter the corrected goods into the stream of commerce.  *See Frontier*, 185 F. Supp. 2d at 1380 (affirming the assessment of marking duties

notwithstanding certification of marking by importer because importer had "failed to obtain authorization from Customs to release the merchandise into the commerce of the United States"); Customs Ruling, HQ 967982, 2006 WL 1555426, at *3 (Feb. 7, 2006).

95.     Importers are not permitted to "self-regulate." *Frontier*, 185 F. Supp. 2d at 1380. Rather, the marking duty statute requires importers to alert CBP when goods arrive unmarked so that CBP can work with importers to ensure compliance.  CBP's ability to enforce the marking duty statute critically depends on the importer's duty to disclose known marking violations at the time of importation.

Requirement of Informed Compliance and Reasonable Care
Under 19 U.S.C. § 1484

96.     The Mod Act implemented an "informed compliance" customs regulatory regime. Toward this end and of relevance here, the Mod Act adopted a "reasonable care" standard, codified at, *inter alia*, 19 U.S.C. § 1484, that requires importers to share responsibility with Customs for ensuring compliance with customs laws and regulations.  *See* William J. Kovatch, Jr., *The Duty of "Reasonable Care" Under the Customs Modernization Act of 1993*, 28 DENV. J. INT'L L. & POL'Y 73 (1999); Timothy G. Moran, *Customs A' La Mode*, VT. B.J. & L. DIG. (1997).

97.     To "secure the release of imported merchandise from Customs custody," an importer must, using "reasonable care," "make entry" upon or shortly after importation by filing entry documentation with CBP.  19 U.S.C. § 1484(a); 19 C.F.R. § 141.0a(a)-(b).  "Entry" is defined as "documentation required by [19 C.F.R. § 142.3] to be filed with the appropriate Customs officer to secure the release of imported merchandise from Customs custody." 19 C.F.R. § 141.0a(a).  Such documentation must, *inter alia*, provide information sufficient to (a) show that imports comply with any "applicable requirement of law" such that they "may be

released" from Customs custody and (b) enable Customs to "properly assess duties on the merchandise." 19 U.S.C. § 1484(a), 19 C.F.R. § 141.0(a-b).

98.     No article in CBP's custody, however, may be released unless it is properly marked with its foreign country of origin or marking duties are deposited pending proper marking, re-export, or destruction. 19 U.S.C. § 1304(j). Consequently, through the provision of entry documentation under 19 U.S.C. § 1484, importers certify to Customs that their goods are properly marked and thus are entitled to be admitted into U.S. commerce, or they must alert Customs to the contrary.

99.     Generally, an importer files "an entry summary for consumption" via Form 7501 when "goods are to be released from CBP custody at the time of entry," in other words, distributed into the stream of commerce. *See* U.S. Customs and Border Protection, Pub. 0000-0504, Importing into the United States: A Guide for Commercial Importers 12-13 (2006) ("Customs Pub. 0000-0504"), *available at* http://www.cbp.gov/sites/default/files/documents/Importing%20into%20the%20U.S.pdf. With respect to marking duties, Form 7501 specifically requires importers to record "any other fee, charge or exaction that applies" and any "estimated duty . . . and any other fees or charges" owed to the Government.

100.     In addition, LDR must also deposit estimated marking duties owed with CBP on or about the time of importation. 19 U.S.C. § 1505(a), 19 C.F.R. § 141.103. Although the amount of duties deposited represents only the importer's estimate of how much money it owes, because entries often automatically "liquidate" by statute at the duty rate estimated by the importer, any false information or omissions in entry documents will directly cause marking duties not to be paid. *See* 19 U.S.C. § 1504(a); 19 C.F.R. § 159.11.

101.    If the release of goods needs to be postponed to mark or re-export the goods, an importer may place them "in a CBP bonded warehouse under a warehouse entry," after which they "may be exported without the payment of duty, or they may be withdrawn for consumption." Customs Pub. 0000-0504 at 14. Form 7512 is typically used when goods are prohibited by U.S. law and thus must be re-exported, but warehouse entries may also be accomplished via the filing of Form 7501 using entry code 21 or 22. *See* 19 C.F.R. § 18.25 & 144.37; U.S. Customs and Border Protection, Pub. HB 3500-11, Bonded Warehouse Manual for Customs and Border Protection Officers and Bonded Warehouse Proprietors 41, 52 (2012), *available at* http://www.cbp.gov/sites/default/files/documents/bonded_warehouse.pdf.

102.    Thus, if goods are not properly marked, an importer has a duty to disclose this at the time of importation, whether by, for example, alerting Customs to this fact via Form 7501 or by filing a bonded entry via Form 7512 such that the unmarked goods are not released from Customs' custody and into the stream of commerce.

103.    By knowingly importing improperly marked pipe without providing CBP any documentation showing that LDR's pipe and pipe fittings still required marking, and without depositing marking duties at the time of importation, LDR clearly violated the duty of "reasonable care" under 19 U.S.C. § 1484(a)(1)(A-B), misleading CBP into releasing LDR's improperly marked pipe and pipe fittings unlawfully.

104.    Indeed, the reasonable care standard of 19 U.S.C. § 1484 was intended to line up with the requirements of 19 U.S.C. § 1592, which imposes a duty on importers to disclose material information. Brief by U.S. in *United States v. Trek Leather, Inc.*, No. 2011-1527, 2014 WL 2738331, at *20 (Fed. Cir. June 2, 2014) ("[O]ne of the purposes of the Mod Act was to

-31-

modify 19 U.S.C. § 1484(a) and bring the responsibilities of the importing community in line with regulations requiring the exercise of reasonable care under 19 U.S.C. § 1592.").

105.    Under 19 U.S.C. § 1592, no person "may enter, introduce, or attempt to enter or introduce any merchandise into the commerce of the United States by means of (i) any document or electronically transmitted data or information, written or oral statement, or act which is material and false, or (ii) any omission which is material."  And CBP regulations expressly state that false representations or omissions with respect to country-of-origin marking and marking duties are material.  19 C.F.R. § Pt. 171, App. B ("A document, statement, act, or omission is material if it has the natural tendency to influence or is capable of influencing agency action including, but not limited to a Customs action regarding: (1) Determination of the classification, appraisement, or *admissibility* of merchandise . . . ; (2) determination of an importer's liability for duty (including *marking*, antidumping, and/or countervailing duty) . . . .") (emphasis added).

106.    Consequently, Defendants routinely made or used, or caused to be made or used, false and fraudulent records and statements material to LDR's obligation to pay marking duties to the U.S. Government, an obligation that Defendants further knowingly concealed and knowingly and improperly avoided or decreased, in violation of the FCA, 42 U.S.C. § 3729(a)(1)(G).

107.    Defendants have thus regularly and systematically violated the FCA.  Defendants further did so "knowingly" as defined in § 3729(b) of the Act.

## COUNT ONE: 31 U.S.C. § 3729(a)(1)(G)
## (Evasion of AD/CV Duties Against All Defendants)

108.    Each of the foregoing paragraphs are incorporated by reference as if fully set forth herein.

109.    Defendants knowingly made, used or caused to be made or used, false records and statements material to an obligation to pay or transmit money or property to the U.S. Government.

110.    These false records and statements included, but may not be limited to, entry documents and representations therein filed by LDR or its agents on or about the time of importation and the failure to post duties owed with respect to LDR's standard pipes and pipe fittings imported from China.

111.    Defendants knowingly concealed an obligation to pay or transmit money or property to the U.S. Government by, *inter alia*, failing to pay CWP AD/CV duties owed on LDR's pipes and pipe fittings and submitting false records or statements in connection with the same.

112.    Defendants knowingly and improperly avoided or decreased an obligation to transmit money or property to the U.S. Government by, *inter alia*, failing to pay the AD/CV duties owed on LDR's pipes and pipe fittings and submitting false records or statements in connection with the same.

113.    As a result of Defendants' conduct, including these false records or statements, the U.S. Government suffered damages, including the amount of CWP AD/CV duties that Defendants owe on LDR's pipes and pipe fittings but have not paid.

### COUNT TWO: 31 U.S.C. § 3729(a)(1)(G)
### (Evasion of Marking Duties Against All Defendants)

114.    Each of the foregoing paragraphs are incorporated by reference as if fully set forth herein.

115.     Defendants knowingly made, used or caused to be made or used, false records and statements material to an obligation to pay or transmit money or property to the U.S. Government.

116.     These false records and statements included, but may not be limited to, entry documents and representations therein filed by LDR or its agents on or about the time of importation and the failure to post duties owed with respect to LDR's pipes and pipe fittings imported from China that were not properly marked with their foreign countries of origin.

117.     Defendants knowingly concealed an obligation to pay or transmit money or property to the U.S. Government by, *inter alia*, failing to pay marking duties owed on LDR's pipes and pipe fittings and submitting false records or statements in connection with the same.

118.     Defendants knowingly and improperly avoided or decreased an obligation to transmit money or property to the U.S. Government by, *inter alia*, failing to pay marking duties owed on LDR's pipes and pipe fittings and submitting false records or statements in connection with the same.

119.     As a result of Defendants' conduct, including these false records or statements, the U.S. Government suffered damages, including the amount of marking duties that Defendants owe on LDR's pipes and pipe fittings but have not paid.

### <u>COUNT THREE: 31 U.S.C. § 3729(a)(1)(C)</u><br><u>(Conspiracy Liability Against All Defendants)</u>

120.     Each of the foregoing paragraphs are incorporated by reference as if fully set forth herein.

121.     Defendants conspired to violate 31 U.S.C. § 3729(a)(1)(G) in violation of the False Claims Act, 31 U.S.C. § 3729(a)(2)(C).

122.     Specifically, Defendants formed an agreement with the object and intent of

defrauding the U.S. Government through the evasion of AD/CV duties and marking duties owed on LDR's pipes and pipe fittings.

123.    Defendants committed one or more overt acts in furtherance of their conspiracy to defraud the U.S. Government.

124.    As a result of Defendants' conspiracy, the U.S. Government suffered damages, including the amount of CWP AD/CV duties that Defendants owe on LDR's pipes and pipe fittings but have not paid.

125.    The Intracorporate Conspiracy Doctrine does not apply to relieve Defendants of conspiracy liability here.  Rather, the doctrine applies to "managers of a corporation [that are] jointly pursuing its lawful business" and thus acting within the scope of their employment. *Spalding v. City of Chicago*, No. 12 C 8777, 2014 WL 917274 (N.D. Ill. Mar. 10, 2014).  The doctrine has thus been held not to apply when corporate employees are motivated solely by personal bias (i.e., when they act on their own behalf or with an independent personal stake in the corporate action) and when a conspiracy is part of a broader pattern or permeated the ranks of the organization's employees.  *Hartman v. Bd. of Trustees of Cmty. Coll. Dist. No. 508, Cook Cnty.*, Ill., 4 F.3d 465, 470 (7th Cir. 1993).

126.    Here, Defendants were not acting within the scope of their employment for lawful business purposes when participating in the fraud alleged herein.  Rather, instead of pursuing the lawful business of LDR, the Greenspons were acting on their own behalf, motivated solely by personal bias, and had an independent personal stake in LDR's evasion of customs duties. Defendants' conspiracy and their conduct in furtherance of the same, moreover, was part of a pattern of unlawful evasion of customs' duties.  Defendants should not be able to avoid the legal consequences of their actions merely because the Greenspons formed GB Holdings and other

shell companies in an attempt to insulate Defendants from liability and funnel the profits from

LDR's ill-gotten gains. The corporate form does not protect Defendants' perpetration of LDR's

fraud for the Greenspons own monetary benefit. Accordingly, the Intracorporate Conspiracy

Doctrine is not triggered here. Rather, the facts alleged herein bring Defendants' conduct within

recognized exceptions to this doctrine.

**COUNT FOUR: 31 U.S.C. § 3729(a)(1)(G)**
**(Alter Ego Liability Against GB Holdings, Larry Greenspon,**
**and Dennis Greenspon In the Alternative)**

127.    Each of the foregoing paragraphs are incorporated by reference as if fully set forth

herein.

128.    In the event LDR, but neither GB Holdings nor the Greenspons, are found directly

liable for violations of 31 U.S.C. § 3729(a)(1)(G) under Counts I and II above, GB Holdings and

the Greenspons are nevertheless derivatively liable for violations of 31 U.S.C. § 3729(a)(1)(G)

pursuant to the theory of alter ego liability.

129.    GB Holdings has operated as the alter ego of the Greenspons for purposes of

committing the fraud alleged herein and LDR has operated as the alter ego of GB Holdings and,

by extension, the Greenspons for purposes of committing the fraud alleged herein. GB Holdings

and the Greenspons are thus liable for any violations of 31 U.S.C. § 3729(a)(1)(G) committed by

LDR by virtue of piercing the corporate veil of LDR and GB Holdings.

**PRAYER**

WHEREFORE, Plaintiffs pray for the following relief:

1.      A permanent injunction requiring Defendants to cease and desist from violating

the False Claims Act;

2.      Judgment against Defendants in an amount equal to three times the amount of

damages the United States has sustained as a result of Defendants' unlawful conduct;

-36-

3. Civil monetary penalties for each false record or statement made, used, or caused to be made or used by Defendants that was material to any obligation to pay or transmit money or property to the U.S. Government and/or for each instance of Defendants knowingly concealing or knowingly and improperly avoiding or decreasing any obligation to pay or transmit money or property to the U.S. Government;

4. An award to Relator pursuant to 31 U.S.C. § 3730(d);

5. An award of reasonable attorneys' fees, costs and expenses;

6. Such other relief as the Court deems just and equitable.

## JURY DEMAND

Relators Roger B. Schagrin and Roger B. Schagrin, PC (d/b/a Schagrin Associates) hereby demand a jury trial on all issues so triable.

Dated: January 8, 2019                        Respectfully submitted,

ROGER B. SCHAGRIN and ROGER B. SCHAGRIN, PC (d/b/a SCHAGRIN ASSOCIATES)


By  /s/ Matthew K. Organ

David J. Chizewer
Matthew K. Organ
GOLDBERG KOHN LTD.
55 East Monroe Street, Suite 3300
Chicago, Illinois  60603
(312) 201-4000

Jonathan K. Tycko
Anna C. Haac
TYCKO & ZAVAREEI LLP
1828 L Street, N.W., Suite 1000
Washington, D.C.  20036
(202) 973-0900

*Counsel for Plaintiffs-Relators*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that on January 8, 2019, he caused a copy of Plaintiffs-Relators' **SECOND AMENDED COMPLAINT** to be served via the Court's ECF/electronic mailing system upon all counsel of record and/or via electronic mail and U.S. Mail, proper postage prepaid, as indicated:

> Steven A. Miller
> Theresa L. Davis
> Kristen A. Bradley
> REED SMITH LLP
> 10 South Wacker Drive – Suite 4000
> Chicago, Illinois  60606
> *Via ECF*
>
> Andrew C. Bernasconi (admitted *pro hac vice*)
> REED SMITH LLP
> 1301 K Street, N.W.
> Suite 1000 – East Tower
> Washington, D.C.  20005
> *Via ECF*
>
> Jimmy L. Arce
> Assistant United States Attorney
> UNITED STATES ATTORNEY'S OFFICE
> 219 South Dearborn Street – Suite 500
> Chicago, Illinois  60604
> *Via electronic mail & U.S. Mail*

/s/ Matthew K. Organ